# UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **FRANCIS MOORE, DEREK DAVIS, SHAWN KEITH, CARLOS NEAL, MARCUS RICHARDSON, BYRON RICKS, BEOWULF SNELL, and PANDRA VAUGHN** | **CIVIL ACTION NO.: _____** |
| | **JUDGE:** |
| *Plaintiffs*, | **JURY TRIAL DEMANDED** |
| **v.** | |
| **THE SHAW GROUP, INC.,** | **MAGISTRATE:** |
| *Defendant*. | |

## ORIGINAL COMPLAINT

Plaintiffs Francis Moore, Derek Davis, Shawn Keith, Carlos Neal, Marcus Richardson, Byron Ricks, Beowulf Snell, and Pandra Vaughn (collectively, "Plaintiffs"), ("Plaintiffs"), by and through their attorneys, bring this action for damages and other legal and equitable relief from the violation of the laws proscribing discrimination based on race, color, and retaliation, stating the following as Plaintiffs' claims against The Shaw Group, Inc., ("Shaw" or "Defendant") and their related subsidiaries, successors, and assigns.

## INTRODUCTION

1.     This is an action brought by Plaintiffs seeking damages from Defendant for acts of intentional discrimination based on race and color as well as for acts of retaliation, because Plaintiffs engaged in protected activity.  Defendant's acts of discrimination and retaliation are in violation of the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1981 *et seq*.; the 1991 Civil Rights Act, as amended, 42 U.S.C. § 1981a *et seq*.; Title VII of the Civil Rights Act of 1964, as amended and 42 U.S.C. § 2000e *et seq*.

**ORIGINAL COMPLAINT**

2.      Employees at Shaw have faced racial discrimination, retaliation, and a hostile work environment for several years.  They have faced racial slurs, several nooses, symbols and depictions such as: "Nigger," "White supremacists rule," "Niggers need to be shipped back to Africa," "Shaw hates niggers," "We don't like these niggers," "Every niggers dream is a white girl," "Nigger lips," "I still got that rope in my tree… you black motherfucker," and rebel flags.

3.      Employees of Shaw were also subjected to racist jokes, remarks, and derogatory names on a daily basis.  These racially offensive names included, "Nigger," "monkey," "boy" "black bitch," and "black ass."   Employees at Shaw also threatened black employees with statements, such as, "are you scared?"  while holding a noose.

4.      Upon information and belief, Defendant has continued to subject Black employees to discrimination, retaliation, and a hostile work environment in violation of the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1981 *et seq*.; the 1991 Civil Rights Act, as amended, 42 U.S.C. § 1981a *et seq*.; and Title VII of the Civil Rights Act of 1964, as amended and 42 U.S.C. § 2000e *et seq*.

5.      Plaintiffs are former hourly employees at Shaw and have endured racial epithets and graffiti at the work place.  In addition, unlike their similarly situated White co-workers, their job performance is under constant scrutiny.  Further, they have not been afforded the same opportunities for advancement or placement as their white counterparts. Their workplaces are regularly filled with disparate treatment and derogatory slurs.

6.       Some Plaintiffs attempted to meet with management in an effort to voice their concerns and have filed verbal and written internal complaints regarding severe disparate treatment, being forced to work in a pervasively racially hostile work environment, and then facing retaliation by upper management when they complained of these issues.  Rather than

**ORIGINAL COMPLAINT**

address these concerns, management ignored their pleas for help and encouraged employees to continue their discriminatory actions.

7.      As such, Defendant has failed to actively and responsibly monitor their workplace for acts of discrimination, and they have failed to take prompt and effective remedial action in response to complaints of such discrimination.

8.      Plaintiffs demand a trial by jury.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of civil rights; (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201; and (iii) under 42 U.S.C. § 2000e, *et seq*., as amended, 42 U.S.C. § 1981 *et seq*., as amended and 42 U.S.C. § 1981a *et seq*., as amended.

10.     Venue is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3), inasmuch as this judicial district lies in a State in which the unlawful employment practices occurred.  Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (c), in that the Defendant maintains offices, conducts business, and resides in this district, and a substantial portion of the acts that make up the basis of the complaint occurred within this judicial district.

## PARTIES

**ORIGINAL COMPLAINT**

11.     Defendant The Shaw Group, Inc. is a Louisiana corporation with its principal place of business located at 5615 Corporate Boulevard, Suite 400B, Baton Rouge, Louisiana 70808. Upon information and belief, Shaw has over 25,000 employees worldwide and annual revenues of $5.9 billion in 2011. Shaw may be served with process by serving its registered agent, CT Corporation System 5615 Corporate Boulevard., Suite 400B, Baton Rouge, Louisiana 70808.

12.     Plaintiff Francis Moore is a person who has been aggrieved by Defendant's actions.  She is and has been, at all relevant times, an African-American female citizen of the United States of America and is a resident of the State of Texas. Plaintiff Moore worked for Defendant in their Fulton, Arkansas location.

13.     Plaintiff Derek Davis is a person who has been aggrieved by Defendant's actions. He is and has been, at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Florida. Plaintiff Davis worked for Defendant in their Fulton, Arkansas location.

14.     Plaintiff Shawn Keith is a person who has been aggrieved by Defendant's actions. He is and has been, at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Arkansas. Plaintiff Keith worked for Defendant in their Fulton, Arkansas location.

15.     Plaintiff Carlos Neal is a person who has been aggrieved by Defendant's actions. He is and has been, at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Mississippi. Plaintiff Neal worked for Defendant in their Fulton, Arkansas location.

**ORIGINAL COMPLAINT**

16.     Plaintiff Marcus Richardson is a person who has been aggrieved by Defendant's actions.  He is and has been, at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Alabama. Plaintiff Richardson worked for Defendant in their Fulton, Arkansas location.

17.     Plaintiff Byron Ricks is a person who has been aggrieved by Defendant's actions. He is and has been, at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Texas. Plaintiff Ricks worked for Defendant in their Fulton, Arkansas location.

18.     Plaintiff Beowulf Snell is a person who has been aggrieved by Defendant's actions.  He is and has been, at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Georgia. Plaintiff Snell worked for Defendant in their Fulton, Arkansas location.

19.     Plaintiff Pandra Vaughn is a person who has been aggrieved by Defendant's actions.  He is and has been, at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Mississippi. Plaintiff Vaughn worked for Defendant in their Fulton, Arkansas location.

## EXHAUSTION OF FEDERAL ADMINISTRATIVE REMEDIES

20.     Plaintiffs who have herein alleged claims pursuant to Title VII have timely filed complaints of discrimination with the EEOC.

21.     Plaintiffs who have herein alleged claims pursuant to Title VII have requested their Notice of Right to Sue letters and received their Notice of Right to Sue letters prior to the filing of this Complaint.

**ORIGINAL COMPLAINT**

## STATEMENT OF FACTS

### A.   FACTS COMMON TO ALL PLAINTIFFS

22.    Black employees of Shaw have been subjected to discrimination and harassment for several years.  This discrimination and harassment manifested itself through the direct manner in which Shaw management and co-workers treated Plaintiffs, and by the systemic atmosphere of bigotry that surrounds them at work.  Upon information and belief, the discrimination and harassment continues to this day.

23.    For years, Black employees have been subjected to racial slurs at Shaw, including the prolific use of the word "Nigger."

24.    Black employees have been exposed to several nooses in the workplace, creating a threatening and hostile work environment as a noose is a symbol that is "among the most repugnant of all racist symbols." *Burns v. Winroc Corp.*, 565 F. Supp. 2d 1056, 1064 (D. Minn. 2008).  Despite knowing the prevalence of nooses in the workplace, Shaw management has failed to take effective steps to address these blatant acts of racism.

25.    Further, the bathrooms and other fixtures at Shaw facilities were covered in racial graffiti, including phrases using the word "Nigger," "monkeys" as well as depictions of lynchings and nooses.  Despite the open and notorious nature of this graffiti and being made aware of such graffiti, management has failed to take prompt and effective remedial measures in response to such acts of blatant bigotry and harassment.

26.    In and around September 2011, the Fulton, Arkansas site had some written bomb threats in the bathrooms.  After these bomb threat, Shaw took extreme measures to put an end to such threats including bringing in more security, putting a $50,000 reward on the news to determine who placed the threats, and closely monitoring the bathrooms.  However, Shaw did

**ORIGINAL COMPLAINT**

not put the time and money into addressing the racist graffiti, which they clearly had the ability to do and were reasonably expected to do.

27.     These examples are only a few of the obvious and severe indications that Shaw management allowed its White employees to harass and degrade Black employees on a daily basis.  Racial animus of this kind exists throughout the workplace and has been condoned and encouraged by Shaw management.

28.     Shaw further discriminates against Black employees by creating a disparity in pay.  White workers bearing the same title and performing the same tasks as Black employees are often paid more money than Black employees doing the same work.

29.     Black workers are not given equivalent raises as their similarly situated White co-workers.  Moreover, White workers with less experience and qualifications are consistently hired in favor of and/or receive promotions and wage increases over more qualified Black employees.

30.     The level of discipline is also much higher for Black employees.   White employees may receive little to no discipline in situations for which Black employees receive formal reprimand, are suspended or terminated.

31.     When Black employees wish to report the aforementioned forms of discrimination to management, or when they do report such discrimination, they are retaliated against through layoffs and terminations.

32.     Charges of Discrimination were filed with the Equal Employment Opportunity Commission, Little Rock Area Office by the Plaintiffs starting in July 2011.

33.     In and around May 2012, investigators from the EEOC went to the Fulton, Arkansas site to conduct an on-site investigation and question many of the individuals mentioned by those who filed Charges of Discrimination.  Upon information and belief, after this took

**ORIGINAL COMPLAINT**

place, many of the people questioned retaliated against plaintiffs who were still employed at that time, or by not rehiring those plaintiffs who attempted to be rehired.

### B.      FACTS SPECIFIC TO EACH PLAINTIFF

#### *Francis Moore*

30.     Frances Moore began working for Shaw in or around December 17, 2007 at their Boyce, Louisiana location and was laid off due to a reduction in force in and around August 2009.  In or about October 2009, Moore was hired at the Turk project in Fulton, Arkansas, as a Millwright, and was paid $25.50 per hour. She was the only black female Millwright at that worksite.  Soon after she was hired, in January or February of 2010, Moore was assigned to work in the tool room.

31.      Out of the approximately 1,000 employees, Moore observed that a relatively small percentage were Black.

32.      On or about June 23, 2011, Moore was asked on one occasion by two white workers, Phil ("Chubby") Groves and Chris Paris, for a piece of piano wire of a certain length. A little later in the day, they handed her a noose made out of the wire that she had given them with an open ketchup packing hanging on it, and said, "Frances, we made you a necklace, make sure you wear it now."

33.      Moore reported this incident to her foreman, David Bryant.  Bryant took it to the superintendent Darren Hillstad.  Hillstad told Jan White in Human Resources.  Upon information and belief, White conducted a superficial investigation, concluding that Moore was handed a halo, and that the ketchup packet represented a butterfly.

34.     Starting in and around December 2010 and continuing up until her resignation in August 2011, Moore suffered numerous other abuses at the hands of her white co-workers

**ORIGINAL COMPLAINT**

Chubby and Paris during her employment at Shaw. They spat on her and passed gas in her face when she bent over.  Moore complained numerous times to her supervisor, Anthony Miller, about how Chubby and Paris tormented her and used racial slurs when referring to Moore such as "Black bitch."

35.     Upon information and belief, Miller was laid off for attempting to help Moore. After Miller was laid off, Moore continued to complain about the hostile work environment to which she was subjected to David Bryant and foreman Trent Gordon.  They did not do anything in response to Moore's complaints.

36.     Moore's white co-workers posted insulting notes on the toolroom walls and doors about her when she left for bathroom breaks, including, "Frances gone to the shit house to take a shit," and "Frances takes a lot of shits."

37.     Moore observed racist writing on work tables, including "NAACP is for niggers, alligators, and piglets," "if you have oral sex with a black girl that's like eating wool." "All the niggers need to go back to Africa," "all niggers need to be shipped back to Africa" and pictures of lynchings of black people.  Moore saw this graffiti, among other similar types of racially derogatory language, on tables and on the side of Shaw's mobile trailer. Moore reported this graffiti to Jan White in HR at the same time that she reported the wire noose.  However, White waited several days before she went out of her office to look at the tables and side of the trailer. That extra time allowed Moore's co-workers to grind the tables and trailers down to eliminate the racist graffiti and drawings.

38.     Moore also observed racially-offensive graffiti written on the walls of the portable bathrooms, including "nigger."

**ORIGINAL COMPLAINT**

39.     Moore learned of a black foreman, Stanley, opening his print shack and finding a noose.  Stanley told Moore about this incident.  Moore also learned of another black employee who was subjected to a noose at Shaw's Fulton, Arkansas location.

40.     Members of management including David Bryant and Lionel Martinez brushed aside Chubby and Paris' conduct towards Moore as "just joking around."

41.     After Moore complained about the wire noose she was retaliated against by being removed from the tool room position at the end of July/beginning of August 2011 and put into an unsafe position in the field.

42.     Moore had tested to become NCCER certified while at the Fulton Arkansas site, but had no prior experience as a journeyman.  She was asked to climb into a tight space to clean sand filters.  Moore got stuck while she was working on the filters and she felt that she was in danger and that the assignment was purposely given to her because it was unsafe.  Moore climbed out of the space yelling, "You all are trying to kill me this is very unsafe, I want to quit." At the time that she was moved from the tool room, Moore was told that she was being moved due to a reduction in force, but Shaw was in the process of hiring millwrights and other employees.

43.     Moore felt threatened by being placed in this new assignment. The employees laughed at her when she got stuck, and she felt threatened as a result. After only being out in the field for three days, Moore requested a transfer from Ed Wick, and was told that there were no transfers available.  She then requested a layoff.  Her request was denied.  As a result of the constant harassment and intimidating work environment, Moore felt that she was left with no other choice but to resign from her position in August 2011.

**ORIGINAL COMPLAINT**

44.     Moore filed a Charge of Discrimination with the Equal Employment Opportunity Commission against Shaw in or around July of 2011. Moore filed a retaliation Charge with the EEOC in or around August 2011.

### Derek Davis

45.     Derek Davis was hired to work for Shaw at their St. Paul, Virginia worksite on or about March 2, 2011 as a Pipefitter Helper earning $18.60 per hour.

46.     Davis was subjected to disparate treatment in terms of his pay.  During Davis' employment at the St. Paul location from March 2, 2011 through June 29, 2011, Mark Strauser, the superintendent at Shaw's St. Paul, Virginia site, brought in several White workers and one Hispanic worker who all received journeymen's pay of approximately $23 per hour, even though they were not qualified to be journeymen and had the same qualifications as Davis. They did not have the proper experience to be paid as journeymen and were not performing journeyman work.  Instead they were performing helper work and should have received helper pay.  Upon information and belief, these employees received this additional pay because of their race.

47.      Davis has been subjected to a hostile work environment throughout his employment with Shaw.  Davis was subjected to racist graffiti in the portable bathrooms at both the St. Paul location and Fulton, Arkansas location, as well the trailer bathrooms at the Fulton, Arkansas site.  Davis saw graffiti such as drawings of KKK members, depictions black persons being lynched, "Nigger," and "White supremacists rule."  Davis also saw rebel flags on and in gang boxes or tool boxes, trucks, hardhats, and lockers.  Despite the fact that during orientation Shaw personnel specifically stated that employees were not to bring anything into the

**ORIGINAL COMPLAINT**

workplace that can be offensive to other people, rebel flags were consistently found throughout the workplace.  Davis found this to be offensive.

48.     In May of 2011, Davis, Davis' foreman, Robert Deaton and another foreman, Bob, were all together.  Bob had a raincoat on with a hood and Deaton said, "Hey you look like a KKK member."  While Davis was standing there, Bob said, "You better be careful what you say." Davis then addressed the comment and asked Deaton why he had said that.  Deaton brushed it off.  Davis complained about the comment to Safety, who did nothing in response to Davis' complaint.

49.     In early June 2011, Davis was subjected to a hostile work environment and retaliation.   Robert Deaton, Davis' foreman, referred to Davis as a "nigger" by saying, "Where's my nigger?"  One of Davis' co-workers, Ed, heard the racial statement and reported this incident to Safety.  Deaton was allegedly terminated, but upon information and belief, Deaton was actually transferred to work at another Shaw location.

50.     After Deaton's alleged termination, but before he returned to work at the St. Paul location, the crew was split up and Davis was laid off two weeks later.  Upon information and belief, no one else on the crew was laid off.  Layoffs are supposed to be based on attendance, but he was only absent one day out of the four months that he was working for Shaw.  Davis witnessed white helpers working in Boilers 11 and 12 miss more work than he did, but they were not laid off.  After Davis was laid off, Deaton returned to the St. Paul, Virginia site.

51.     Davis reviewed a list of other job sites for which Shaw was hiring.  He called the number for the Fulton, Arkansas location and was hired approximately eighteen days later.

**ORIGINAL COMPLAINT**

Davis started working at the Turk Project in Fulton, Arkansas for Shaw on or about July 18, 2011.

52.     Davis was discouraged from advancing at Shaw.  In or around August 2011, Davis signed up to take a welding test through Shaw in Lake Charles, LA.  He took some days off to do so.  When he returned, Davis' foreman, Robin Drummond, provided Davis with a written disciplinary action for missing days and he was suspended by Jan White in Human Resources.  This was the only written disciplinary action that Davis received while working with Shaw.  White employees including Johnny (top helper) and another journeyman pipefitter were allowed to miss days and were not written up or suspended.  The following Wednesday he was called to come back to work by Carla in Human Resources and he was paid for the days that he was suspended.

53.     On or about October 17, 2011, one of the welders, Dean, on Davis' crew referred to Davis as "boy" during their lunch break.  Davis told him that he did not like being referred to as "boy."  Later on that same day, the welder called Davis "boy" again.  Davis reported this to Ed Wick in Human Resources.  Upon information and belief, the welder, Dean, was not disciplined, despite Shaw's harassment policy requiring some form of discipline for such actions.

54.     On or about October 20, 2011, Davis found a noose on the ground floor at the Fulton, Arkansas location with his co-worker Marcus Richardson.  They were finishing up their day around 5 p.m. and were headed back to their print shack to finish up and put tools up.  Richardson saw the noose first, and notified Davis and then Davis saw it.  The noose had several knots in it.  Richardson said he was going to call their foreman Robin Drummond and safety and let them know that there was a noose.  When Drummond was informed she called in

**ORIGINAL COMPLAINT**

an employee from safety, Ed Wick from Human Resources, and the General Foreman, Tim. Wick told Davis and Richardson to keep it quiet, but he or the Safety employee indicated that other nooses had been found at the facility.

55.     Two to three hours after Davis and Richardson came to work on October 21, 2011, they were laid off.  They were told that the reason for the layoff was a reduction-in-force. However, they still had a lot of work to be done in their department, and they were the only two helpers there.  They usually helped their crew set up and Davis knew that the area that they were working in was a long way from being finished.  Out of the seven or eight members on their crew, Davis and Richardson were the only Black employees on the crew and were the only ones to get laid off.   Additionally, approximately every three months, Davis received an evaluation.  Davis always received satisfactory evaluations and maintained good attendance. Upon information and belief, Davis was laid off in retaliation for reporting the noose.

56.     In or around November 2011, after being laid off, Davis called the corporate office in Baton Rouge, Louisiana and requested to work at another job site for Shaw.  At the time that he called Shaw, he was aware that Shaw was hiring in Eaton, North Carolina based on conversations that Davis was having with Nick, one of Shaw's recruiters.  Despite his efforts, and knowledge that Shaw was hiring, Davis was not rehired at this time.

57.     Davis filed a Charge of Discrimination with the Equal Employment Opportunity Commission in or around January 2012, and his charge was received by the EEOC on January 17, 2012.

58.     Davis continued to try to reapply for work with Shaw.  Davis was eventually rehired in or around March 14, 2012 at the Fulton, Arkansas location, but this employment period was short lived when he was laid off on June 28, 2012.  During this period of

**ORIGINAL COMPLAINT**

employment, Davis worked the night shift. One of Davis' co-workers had a confederate flag in his locker. Davis found this offensive, but was afraid to report it because of his prior experience reporting a noose at Shaw. Davis returned to work at Shaw as a Pipefitter Helper in Fulton, Arkansas on or about August 14, 2012 at the Fulton, Arkansas location. He was laid off within thirty days, on or about September 13, 2012.

59. Davis has observed that despite his good attendance and work ethic he was always one of the first to be laid off when Shaw has layoffs. Upon information and belief, Shaw's layoff practice involving Davis is in retaliation for Davis reporting discrimination, a hostile work environment and for filing a Charge of Discrimination with the EEOC.

### Shawn Keith

60. Shawn Keith was hired to work for Shaw at their Fulton, Arkansas job beginning in June of 2009 through June of 2010, and again from December 2010 to October 2011. For the first eight months of his employment, Keith worked as a Concrete Helper, and for the remainder of his employment, as a Pipefitter Helper earning approximately $19.20 per hour for the entire duration of his employment.

61. Keith's work environment at Shaw was comprised of predominately white employees.

62. Keith and his similarly situated Black co-workers have been subjected to a hostile work environment at Shaw. In or around January of 2011, Keith's supervisor made a racist remark to him. Keith was speaking to Patrick Dennis, his black co-worker, and three white co-workers including Bruce. Patrick Dennis asked if anyone had seen the show "1,000 ways to Die." Keith's supervisor, Dealous Smith, then suggested one way in which one could die and said, "I still got that rope in my tree … you Black motherfucker."

**ORIGINAL COMPLAINT**

63.     Keith was offended by Smith's comment and asked to speak with Smith privately.   Keith then told Smith that he did not appreciate his racist comment.   Smith responded, "I was talking to Patrick."   Upon information and belief, Smith has also used the phrase "nigger lips" at the workplace.

64.     Keith reported Smith's racist comment to Human Resources Representative, Lee Hendricks.  Lee Hendricks called Keith, Patrick Dennis, and Smith into Human Resources and had them write statements about the incident.  Smith was then called into the office along with superintendent, Billy Youngblood.  Smith admitted to making the statement and explained that he was referring to hanging him in a tree, and said he was "just playing."  Upon information and belief, Smith received no disciplinary action as a result, despite Shaw's harassment policy requiring disciplinary action in such situations.   He was not suspended or effectively disciplined and at the conclusion of Keith's employment with Shaw, in and around October 2011, Smith was still a supervisor.

65.     Keith and his black co-workers have observed multiple nooses hanging in various areas of the Fulton, Arkansas worksite.  On or about September 19, 2011, Keith reported to Tom Kadig in Human Resources that Gary Oglesby created and hung a noose in the workplace.  Keith recalls seeing six or seven knots in the noose.  When Keith walked through the door, Marcus Taylor, a white co-worker said to Gary Oglesby, "You better take this down because Shawn just walked through the door."   Keith went to the office immediately and reported it to Tom Kadig.  Upon information and belief, Gary Oglesby was not disciplined and no one was questioned about the noose.

**ORIGINAL COMPLAINT**

66.     Keith saw another noose hanging from the rafters in and around the fall of 2011. Upon information and belief, the noose was hung by someone on the nightshift because it was there when Keith arrived in the morning. Another employee reported the noose that was seen.

67.     Another noose incident occurred in April or May of 2011. A black supervisor, Stanley walked in one morning and saw a noose hanging in his print shack. Keith learned of this noose through word of mouth at the plant.

68.     In addition to this noose, Keith has seen other nooses displayed at the facility and saw one noose displayed for about one week in July 2011 in the water treatment building. Upon information and belief, no one has been disciplined for displaying nooses in the workplace and Defendant did not take effective remedial steps to prevent the continued hostile work environment.

69.     Keith was subjected to racist graffiti at Shaw's Fulton, Arkansas facility. He saw rebel signs and racially offensive graffiti such as, "Shaw hates niggers," pictures of a black person with a rope hanging from his neck representing a lynching, and "monkeys." Keith saw references to the KKK. This graffiti was in the permanent bathrooms for Shaw employees. This was in the bathroom for a long time without any effort to cover this up or address the problem. Only after the facility received a written bomb threat in the bathrooms, were the bathrooms monitored.

70.     Shaw never did anything to address the rampant racial hatred that was continuously displayed at the worksite. After the monitoring of the bathrooms began, there was still racist graffiti displayed in the bathrooms.

71.     Shaw maintains a discriminatory practice of not promoting Black employees into better positions for which they are qualified, while promoting less qualified White

**ORIGINAL COMPLAINT**

employees into higher paying positions. Keith was impacted by this practice when Shaw failed to promote him.

72.    Keith was working as a Class 4 Helper and was trying to get promoted to a top helper.  Keith began inquiring about a promotion to top helper in January 2011.  Keith was told that he needed to have thirty months of experience as a pipefitter helper in order to get promoted to a top helper, which would make him eligible for a higher rate of pay.  Keith spoke with Lisa Lucket in Human Resources about getting a promotion.  Lucket pulled Keith's resume and saw that he had the requisite experience to be promoted.  Keith then showed his foreman, Brian Penka, that he had the experience to get promoted.  Penka said that he would talk with Tom in Human Resources.

73.    Keith was not promoted subsequent to this and was never given a reason for not receiving a promotion.   After Keith did not receive any word on his promotion, he went to the office and spoke with Tom and someone from HR, but despite these efforts, Keith was not promoted.  Keith was earning $19.20 as a Class 4 Helper, and had he received the promotion he would have been earning $21.60 per hour.  He has observed white co-workers, including Scott and Dustin who had worked for considerably less time than he had at Shaw, receive promotions over him.  Scott was hired in March of 2011 and Dustin was hired in December of 2010.

74.    Keith complained to his foreman, Penka, about this unfair promotion process, but Penka did nothing to promote Keith.   Keith also spoke to Billy Youngblood, the superintendent, and asked why the white workers got promoted even though they had not been there as long as Keith had.

75.    Due to the inherent inequality, unfairness, and hostile work environment that Keith experienced at Shaw's Fulton, Arkansas location, Keith felt that he was left with no other

**ORIGINAL COMPLAINT**

choice but to resign.  Keith sought out other opportunities and resigned from his position at Shaw in October 2011.

76.     Keith filed a Charge of Discrimination against Shaw with the Equal Employment Opportunity Commission in and around September 2011, and was received by the EEOC on September 2, 2011.  Keith filed an Amended Charge with the EEOC in and around December 2011.

### *Carlos Neal*

77.     Carlos Neal began his employment with Shaw at their Fulton, Arkansas location on or about April 6, 2011 as a Pipefitter.  His pay rate throughout his employment was approximately $24.00.  Neal resigned on or about October 10, 2011.  Neal then returned to Shaw in December 2011 and resigned in or around June 8, 2012.

78.     Neal saw several nooses between April of 2011 and September of 2011.  Byron Ricks, a black Shaw employee, pointed out a noose to Neal in or around June or July of 2011 in the power block unit. Neal saw the other nooses in the power block unit hanging scaffolds and beams from the 127 elevation in the STG building.  He saw these nooses throughout the summer of 2011.  His co-workers would come through and say "go look at that," and he and other workers would go to see what was in the area.  Neal and his black co-workers would bring up the noose problem to the foremen, Brian Penka and Mike Sears, during safety meetings in the mornings.  Penka and Sears would claim that it was not their problem.  They both were aware of the nooses, but they did nothing to address it or elevate their employees' concerns to upper management or HR.  No one was ever questioned or asked about the nooses and no investigations took place to determine who was putting up the nooses.  Some of the nooses would be up for days at a time.

**ORIGINAL COMPLAINT**

79.     In and around September 2011, the Fulton, Arkansas site had a written bomb threat in the bathrooms.  After this bomb threat, Shaw took extreme measures to put an end to such threats including bringing in more security, putting a $50,000 reward on the news to determine who placed the threat, and closely monitoring the bathrooms.  Shaw did nothing to address the nooses.

80.     Shaw's client, American Electrical Power ("AEP"), found a noose in September 2011.  They took it down and took pictures of it.  This was reported to the safety attendant.  Additionally, a black foreman, Stanley Reed, found a noose in his print shack in or around June 2011.   Carlos Neal talked with Stanley Reed that weekend.   Reed was terminated soon thereafter.

81.     Throughout his employment, white employees including Mike Sears, Shawn McWhorter and Brian Penka routinely referred to Neal and other Black employees as "boy" and "black ass" on a daily basis.  Shawn McWhorter would also continually harass Neal by saying things such as "suck my dick" to Neal.  Sears, McWhorter, and Penka would constantly harass Neal in front of his co-workers by making demeaning comments such as, "They shouldn't be paying you."

82.     Throughout his employment, Neal and his similarly situated Black co-workers were subjected to racist graffiti at the worksite including "Nigger," "Racism is a crime and crime is for Niggers," and "We don't like these Niggers."   The graffiti was constant and ongoing.  When Neal worked in the power block unit he also saw the following in reference to Dr. Martin Luther King, Jr.: "Why do black people have nightmares? Because the last one that had a dream got killed."  He saw this around January or February 2012.  Throughout his employment,  and during both periods of employment, he saw racist graffiti such as that

**ORIGINAL COMPLAINT**

described above in the portable bathrooms and trailers.  This kind of graffiti was common, but Shaw did nothing to address the problem.

83.     Neal and his black co-workers would complain to their foremen, Penka and Sears, about the graffiti during the morning safety meetings, but their foremen did nothing in response.  After the bomb threats, there were efforts to spray paint over the graffiti, but the racist graffiti would be re-written.

84.     Neal saw Confederate flags all throughout the plant on his white co-workers' tool boxes.  He also saw white supremacist symbols as tattoos such as swastikas and lightning bolts.  Neal also saw these symbols on tool boxes and in the bathrooms.

85.     Neal experienced racial tension on the job on a daily basis.  When employees came to work in the morning, only white workers were allowed to sit down at the picnic tables. On one particular day, in the spring or summer of 2011, Neal was sitting at a table during lunch and a white Pipewelder on Penka's crew, Marcus (who went by "Dennis"), placed his lunch in front of Neal, and then waited for Neal to get up from his seat.

86.     Neal was subjected to racially discriminatory behavior while on the job. He received write-ups for actions of his peers that were falsely associated with him.  For instance, he was written up in May of 2011 for rectifying the mistake of coworkers who incorrectly placed a pipe, causing the potential for property damage. Neal and two other Black workers, Shawn Keith and Sammy Trailor, were ordered to correct the mistake, and upon correcting the mistake, were disciplined by Matthew Brown, General Foreman, for allegedly incorrectly fixing the issue.  However, the White employee who incorrectly laid the pipe initially was not disciplined.  On the day that they were written up, it was raining and they were told to go home

**ORIGINAL COMPLAINT**

as "early out," but no one else was sent home that day.  Neal lost the rest of the day's pay as a result.

87.     In May 2011, Neal was accused of mismanaging a pipe and was threatened with being demoted to a class five Helper.  The superintendent Billy told Neal that he would have to sign a write-up and demote himself.  Neal refused to demote himself.  On that same day, AEP, Shaw's client, called Brian Penka about a protocol violation.  James Revels, a white employee on Penka's crew, was welding a pipe with the wrong wire.  Penka and Revels knew that it was not the correct wire, but happened to have the wire there with them and did not want to waste time going to get the proper wire.  Revels was not written up for this.  Additionally, prior to becoming a foreman, White co-worker, Mike Sears, egregiously mismanaged a pipe over a two-week period, cutting it up 25 times against protocol, and was not disciplined.  Mike Sears was instead promoted to Foreman shortly thereafter.

88.     White workers are routinely promoted more quickly than their black counterparts, regardless of seniority, experience, or performance.  For example, Neal witnessed white workers with less experience being promoted over Shawn Keith, including Scott Eisenhower.  Additionally, Mike Sears was promoted to a foreman over Neal in June 2011. Based on his experience and qualifications, Neal was qualified to be a foreman starting in April 2011.  Had he been promoted, Neal would have received about $2 to $3 more than what he was earning as a Pipefitter.

89.     Neal resigned in or around October 10, 2011 because he was frustrated with how he was being treated and targeted.  He found a job earning less than what he was earning at Shaw and decided to reapply to Shaw in an effort to advance his career in and around December 5, 2011.  He was earning $25 an hour as a Pipefitter for Shaw during this second

**ORIGINAL COMPLAINT**

period of employment.  However, once on the new job, Brian Penka told Neal's new foreman, Eric Bethany, that he "wasn't worth shit." Neal believes this statement was racially motivated. Eric Bethany would watch Neal closely and even asked other workers, including Herman Brown to watch Neal.  Once Bethany learned that Neal was a hard worker and knew what he was doing, he approached Neal and told him what Penka had said.

90.     Neal filed a Charge of Discrimination against Shaw with the Equal Employment Opportunity Commission in and around January of 2012.

91.     Neal moved to the Safety Department as an Instructor towards the end of February 2012.  During his orientation for Safety, Neal was informed that after 90 days, he would receive a raise.  After 90 days, Neal asked about receiving his raise.  Neal also had been informed that his employment status would change allowing him to receive a higher per diem rate.  Neal did not receive a raise or the per diem pay increase.  Feeling mistreated and frustrated, Neal resigned to look for better career opportunities.

### Marcus Richardson

92.     Marcus Richardson began his employment with Shaw at their Fulton, Arkansas location on or about July 27, 2011 as Pipefitter Helper earning $21.60 per hour.  He was laid off on or about October 21, 2011.

93.     Richardson was subjected to a hostile work environment at Shaw.  Throughout his employment, White employees frequently referred to Black employees as "boy."  White employees spoke to Richardson and other Black employees in a condescending tone as if they are uneducated and inferior.

94.     Richardson saw racist graffiti in the portable bathrooms and trailer bathrooms. He saw things such as "Niggers go home," "The only good nigger is a dead nigger," among

**ORIGINAL COMPLAINT**

other racially derogatory comments and "jokes."   Upper level management and corporate tended to use the trailer bathrooms, which were cleaned more regularly than the portable bathrooms, but that did not prevent new graffiti from being written.   Richardson saw racially offensive graffiti at Shaw throughout his employment.

95.     Richardson saw Confederate flags in  the parking lot, on gang boxes, and on hardhats.  Richardson found this offensive.  Richardson also saw white employees with tattoos of white supremacist symbols including lightning bolts.

96.     Richardson was subjected to disparate treatment in the form of discriminatory promotions.   In or around September of 2011, Richardson noticed that there were many instances where White employees were given promotions and wage increases over him. A position became available in the Pipe Department, for which Richardson was qualified.  He applied for the position in and around the end of August or beginning of September 2011 by going to HR and inquiring.  He was told that because he was already in the system he just had to let them know that he was interested and so he let them know that he was interested in the position.  The position was ultimately offered to a White employee, Peter, who was hired about three to four weeks after Richardson was hired.  Richardson had trained Peter and was more qualified for the position than Peter.  Had Richardson been promoted he would have earned more than what he was earning.  After this happened, Richardson spoke to his foreman, Robin Drummond about the situation.  Drummond told him not to worry about it and simply said, "Something will come up."

97.     In or around October 20, 2011, Richardson and another Black employee, Derek Davis, saw a noose in their work section, the auxiliary boiler.  Richardson reported the noose to his General Foreman, Robin Drummond, and her supervisor. Ed Wick, the HR Manager, was

**ORIGINAL COMPLAINT**

called to the scene as well as Roy, the Safety Manager.  Roy tried to downplay the situation and told Richardson that it was not actually a noose but a special kind of knot that they were using upstairs.  Roy told both Richardson and Davis that they found a "real noose" on the floor above them the week prior.  Roy would not let Richardson or Davis take pictures of the noose.  However, the next day, October 21, 2011, when Richardson came in to work, the noose was gone, and both Richardson and Davis were laid off that day.  A week prior to his layoff, Richardson received and signed a perfect evaluation with a 100% score for all elements of the evaluation from his foreman, Robin Drummond.  Upon information and belief, Richardson was laid off in retaliation for reporting the noose.

98.     Richardson filed a Charge of Discrimination against Shaw with the Equal Employment Opportunity Commission in or around December 2011.

99.     Richardson reapplied to work for Shaw for a warehouse position in Mobile, Alabama in and around September 2012, by submitting his application and resume online.  He did not hear back from anyone regarding his re-employment.  Upon information and belief, Shaw's failure to rehire Richardson is in retaliation for his complaints of discrimination and filing a Charge of Discrimination with the EEOC.

### Byron Ricks

100.     Byron Ricks began his employment with Shaw at their Fulton, Arkansas location in or around April of 2011 as a Lead Man Electrician earning $24 an hour.

101.     Ricks was qualified to be leadman/foreman, and he became a foreman around October 2011, when his foreman, Martinez went out on medical leave.  However, when he got the position as foreman, many of his White workers would not do what he asked them to do.  Out of 15 to 20 foremen, Ricks was the only black foreman in the Electrical Department.

**ORIGINAL COMPLAINT**

102.    When Martinez returned in November 2011, Martinez received a new crew and Ricks' crew got split up.  Ricks continued to supervise some of the employees who had been on his crew and he also received some new employees.

103.    White foremen were treated differently than Ricks.  For instance, whenever the bell rang at the beginning of his shift, Ricks was singled out by his supervisor, Jason Westfall. Ricks was told that he must be at his work station at 7 o'clock, however, White foreman such as Chad Sudberry were allowed to clock in by 7 o'clock and did not have to be at their workstations by that time. Ricks started coming in earlier than his White co-workers to avoid having Westfall harass him.

104.     Throughout his employment with Shaw, Ricks was subjected to a hostile work environment in the form of racial slurs and racist graffiti in the bathrooms.  He has seen things such as "Niggers," depictions of the KKK, "Every niggers dream is a white girl," a picture of a black person with a monkey face and "scared nigger" written at the top, and "Shaw hates niggers."  He saw this graffiti, and graffiti such as this, throughout the portable bathrooms, the trailer bathrooms, and on picnic tables.  One of the sanitation workers, Melvin, a black male, attempted to clean up the graffiti, but despite his efforts it continued to return.  Shaw did nothing to try to address the problem.

105.    Ricks would hear "black jokes" from his white employees.  Len Goldman, his leadman and a white employee, said something to the effect of, "Aslama my nigger" to a black employee, Andrew Gotti, who was Muslim.  Gotti complained to Jason Westfall.  Westfall moved Gotti to a different crew on a different shift and within a month, he was laid off.

106.    White employees displayed rebel flags on their cars and rebel flag stickers on their windows and tool boxes.  There was a rebel flag on a tool box in the Pulverizing Bay,

**ORIGINAL COMPLAINT**

which was visible to all workers in that area.  A white Shaw employee, Rodney Lauften, also regularly kept a rebel flag on his truck.  In and around August of 2011, Ricks reported the rebel flags and graffiti to his foreman, David Martinez and to Jan White in Human Resources, but nothing was done to stop the offensive conduct or investigate who was responsible.

107.    Ricks and his black co-workers have been subjected to nooses in the workplace. In and around October of 2011, Ricks learned of a Black employee, Roy Johnson, who found a noose.  Roy reported this incident to HR, but nothing was done to investigate or determine who was responsible.  On and about October 27, 2011 around 5 p.m. Ricks observed one of his co-workers, Cgaime Delatorie, holding a noose at the 127 elevation in the power block unit.  He pointed this noose out to Carlos Neal, a black co-worker.   Delatorie looked at Ricks with the noose and said, "Are you scared? You gonna go tell Jason?"  Ricks saw another noose on the floor in October 2011 at the 232 elevation.  He told Jason Westfall about the noose.  Westfall brushed it off as a "holding knot."  Another incident in and around December 2011 at the 151 elevation, involved Josh Roten, a white electrical helper, who was talking to a bunch of workers, and when Ricks turned around he saw him making a noose. In and around December 2011 or January 2012, Chad Sudberry, a white foreman, put a noose over Jerome Henderson's neck while they were in the heater building.  Henderson was a black employee at Shaw. Antoine William, a black employee, took a picture and showed the picture to Ricks in and around February or March 2012. Shaw never took any steps to address the nooses that were displayed in the workplace.

108.    Throughout his employment, Greg Colk, the superintendent and electrical foreman, harassed Ricks on a regular basis.  Ricks felt that his job was constantly being threatened.  Upon information and belief, Colk was purposely trying to single Ricks out so that

**ORIGINAL COMPLAINT**

Ricks would be driven to quit.  White lead men were not approached by Colk in the same manner as Ricks was approached.  Ricks believes he was being treated this way because of his race and because he was the only Black Leadman Electrician.

109.    Throughout his employment, Jason Westfall would not allow Ricks to have the same authority over his crew that he let White foreman have over their crews.  Westfall would purposely give information to an employee on Ricks' crew, Robin Robertson, a white employee rather than give information or instructions to Ricks directly.  Ricks complained about this to Westfall.  Additionally, White foremen typically got to choose their own leadman, but Ricks was not afforded this opportunity and would have his leadman chosen for him.

110.    Ricks was also supposed to have the authority to determine which employees on his crew were eligible for raises, but this authority was also removed.  Two black members of Ricks' crew, Antoine William and Jerome Henderson, had been employed for over a year and were deserving of raises. Despite this, they were not given raises while on Ricks' crew; however, Westfall gave a raise to white employee Mr. Rhodes after he had been employed for only six months.  Ricks asked Westfall why he did not have to sign off on the raise, and Westfall said that he had taken care of it.  Ricks complained about this discriminatory practice to Bonetta Cooper, a black female, in Human Resources.  Cooper was hired at the Fulton, Arkansas site in and around December 2011 or January 2012.  Prior to this, he had complained to Jan White about this practice, and White did nothing to address the issue.  Cooper started to look into the problem and saw that several employees had been passed over for raises.

111.    White foremen were given discretion in terms of who they wanted on their crews; Ricks was not given the same discretion.  As an example, Cgaime Delatorie requested primarily Hispanic employees on his crew, which was granted.  However, Ricks had crew

members who were problematic and Westfall refused to discipline them.  For instance, white employee Rodney Lauften often refused to listen to directions from Ricks, and he refused to put on his harness.  Although Ricks was the foreman, the authority to discipline had been stripped from him as management and his crew members did not recognize his status as foreman.  Ricks asked Jason Westfall to move Lauften to another crew.  Westfall refused.

112.    In November 2011, Ricks observed that white employees were disciplined less severely than Black employees for safety violations.  Typically, safety violations require termination, but Chad Sudbury and another white leadman had a safety violation for not following protocol with a pipe that was over six feet tall.  Both were suspended for three days and then able to come back to work.    However, Beowulf Snell, a black employee, was terminated for a safety violation involving one of his leg straps coming undone.  Just days before he was terminated, he reported his co-worker to HR for calling him a "nigger."  Within a few hours of Snell being transferred to another crew he was terminated.  Ricks had offered to have Snell on his crew, but Westfall said that he already knew that he was going to move him to Sudberry's crew.  It was not uncommon for leg straps to come undone, as Ricks had also experienced this happening.

113.    Ricks filed a Charge of Discrimination with the Equal Employment Opportunity Commission in or around February 2012, and was received by the EEOC on February 17, 2012.

114.    In and around May 2012, investigators from the EEOC went to the Fulton, Arkansas site and questioned Jason Westfall, among other employees.  After this, Westfall questioned Ricks in a hostile manner about his complaint with the EEOC and his discrimination claims.  After this argument, Ricks complained to Jan White in Human Resources about how

**ORIGINAL COMPLAINT**

Westfall was arguing with him over his EEOC Charge of Discrimination.  White brushed it aside and did nothing in response.

115.    About a month later, Ricks was laid off from Shaw on or about June 8, 2012 due to a "reduction in force."  However, Ricks believes he was laid off in retaliation for filing a charge of discrimination against Shaw with the Equal Employment Opportunity Commission. On the day that Ricks was laid off, Ricks and the only other black employee on his crew at the time, Deqagan Fagins, were laid off.  No other members of Ricks' crew were laid off. Typically, when there is a reduction in force, the foremen are not laid off before their crew members; however, in this case, Ricks was the foreman and he was laid off while the rest of his crew, with the exception of the only other black employee, were retained by Shaw.

### Beowulf Snell

116.    Beowulf Snell began working for Shaw on or around July 27, 2011 as an Electrician earning $24 an hour.  Snell was terminated on or about October 27, 2011.

117.    Throughout his employment, Snell was subjected to a hostile work environment.  Snell heard white employees using racial slurs such as "nigger" and "monkey" when referring to Black workers.  He heard such slurs on a regular basis, at least once per week throughout his employment.  Snell complained to his foreman, Marty Pantenoble about the racial slurs, but Pantenoble never did anything to address these complaints.

118.    On a daily basis throughout his employment, Snell was subjected to racially offensive graffiti in the portable bathrooms, the permanent bathrooms, and on walls in the plant.  He saw graffiti such as "nigger" and "monkey."  There was no effort by Shaw to clean up the racist graffiti. Snell complained to his foreman, Marty Pantenoble, a number of times

**ORIGINAL COMPLAINT**

about the graffiti and Pantenoble said he would pass it on to his boss.   Snell also saw rebel flags in white co-workers work spaces, including on tool boxes and on their hardhats.

119.   Snell observed that White employees were promoted more quickly than black employees.  For example, Marty Pantenoble has very little experience to be a foreman.  This particular job was his first foreman position and his second industrial job in his career. Foreman positions are supposed to be filled based on qualifications and experience – two things that Pantenoble did not have.  Snell, however, is a licensed electrician in four states and has worked as foreman for other jobs, had two active journeyman certifications and was NCCER certified.  Pantenoble had none of these qualifications.

120.   Out of 300 electricians at Shaw, there was only one Black foreman, Byron Ricks.  Snell spoke to the General Foreman, Jason Westfall, about two openings for foreman positions in and around September 2011.  Westfall told him that there was nothing available, but if anything became available he would get back to him.  Westfall never got back to him about any foreman positions, but Snell witnessed several white employees hired as foremen at that time for other crews in the Electrician Department.

121.   On or about October 23, 2011, Snell was up on an elevation and filling out wire labels, when he heard his foreman, Marty Pantenoble, and three other employees, James Stewart (White male), Jeremy Wittington (White male), and Charles Towers (Asian male) having a conversation about Black people.  Snell heard Towers say "Nigger" at least three times.  Upset by this, Snell went up to Towers and asked him why he was talking like that around him.  Towers started cussing at Snell.  Snell said that he was going to report this conduct to Human Resources.

**ORIGINAL COMPLAINT**

122.    Foreman Pantenoble warned Snell to not go to HR and said that there was no time for HR because it involved a lot of paperwork.  The following day, Snell reported what had happened to Ed Wick in Human Resources.  All four of the employees involved in the incident were called into HR and denied everything.  Prior to going into HR, Jeremy Wittington admitted to Snell that Pantenoble had coached the other men involved in the incident about what to say.  Later on that day, Towers approached Mr. Snell and said that he had said, "Nigga" not "Nigger."  Snell's fiancé called corporate to report what had happened anonymously.  Two days later, Snell called corporate to complain again.  He was told that they would investigate, but he never heard back from corporate.

123.    After complaining, Pantenoble and the rest of the crew treated Snell differently.  While Snell always put up with problems he faced since he began working at Shaw, he felt that the degree of the problems had changed and that he was being treated differently.  Additionally, his work was more heavily scrutinized after he complained.  Everybody on his crew started ignoring him, they would not talk to him during the morning meetings, and they treated him like an outcast.

124.    A few days after he complained, Snell requested a transfer from General Foreman Jason Westfall.  Snell was transferred on or about October 27, 2011 to another crew under Chad Sudberry.  On Snell's first crew, out of seven employees, Snell was the only Black worker.  On this new crew, out of eight employees, only two employees, including Snell, were Black.

125.    Sudberry told Snell that he knew what had happened on the other crew.  Snell knew that Sudberry and Pantenoble were close, but he was hoping for better treatment on this crew.

**ORIGINAL COMPLAINT**

126.     On or about October 27, 2011, the same day he was transferred, while working on Sudberry's crew, Snell was working using a harness and pulling cable.  However, his leg strap came undone due to equipment failure.  Sudberry immediately called Snell down and brought him to HR.  Snell was terminated.  Upon information and belief, Snell was terminated as a continuing act of discrimination and in retaliation for his complaints to Human Resources of a hostile work environment and discrimination.  Further, Snell learned from Byron Ricks that on October 28, 2011, Sudberry was caught by AEP, Shaw's client, above six feet without a harness, which was against company safety procedures.  He was not terminated despite completely failing to follow safety protocols.

127.     Snell filed a Charge of Discrimination against Shaw with the Equal Employment Opportunity Commission in or around March of 2012, and was received by the EEOC on March 20, 2012.

128.     After he was terminated, Snell attempted to reapply for work at Shaw in and around end of December 2011/January 2012, after seeing an advertisement on the internet for work at a shutdown.  He spoke to a recruiter who said that they would check.  Snell never heard back from the recruiter and was not rehired.  Upon information and belief, Shaw's failure to rehire Snell was discriminatory and in retaliation for his complaints of discrimination and hostile work environment.

### *Pandra Vaughn*

129.     Pandra Vaughn began working for Shaw at their Fulton, Arkansas site on or about May 13, 2011 earning $24 an hour as a Pipefitter.  He was terminated in or around September 2011.

**ORIGINAL COMPLAINT**

130.     Vaughn was also subjected to racist graffiti in the portable bathrooms and trailer bathrooms at Shaw, including things such as, "Niggers," "More power to the KKK," "All black men want white women, "Monkey," and "All niggers need to leave and go back to Africa."  Vaughn saw this graffiti on a daily basis up until the time when he was terminated in September 2011.

131.     Vaughn and his black co-workers were subjected to a hostile work environment at Shaw where nooses were frequently displayed in the workplace and Shaw did nothing to address them.  One of Vaughn's co-workers, Gary Oglesbee hung a noose.  Shawn Keith was working with Oglesbee at the time and told Vaughn that Oglesbee had hung the noose.  Keith told Oglesbee to take it down and Oglesbee said, "I'm just playing."  Another black employee, Francis Moore told Vaughn about how she was handed a noose by two white employees.  Vaughn also learned of a noose that was found in another building. Vaughn took these nooses to be direct threats against him and other black workers at Shaw, and he felt that they were working in a hostile environment.

132.     Throughout his employment, Vaughn and another Black employee, Shawn Keith, were regularly assigned to work in dangerous areas of the plant with extremely hot working conditions by their foreman, Brian Penka.  White employees were not asked to work in these same conditions.

133.     Vaughn was discriminated against through disparate treatment in terms of pay and promotions.  At the time of his hire, Vaughn was NCCER certified, but Shaw would not give him the appropriate pay for his qualifications.  He was told by Heather in Human Resources that in order to receive greater pay he needed to be NCCER +.  The + was a "hands on" test, where a General Foreman observed that the employee was capable of performing the

**ORIGINAL COMPLAINT**

work. When he expressed interest in taking the "hands on" test, Heather told him that he needed to be re-tested because his certification was old. Management intentionally delayed his new certification for approximately two months, despite the fact that Vaughn had the qualifications and was actually performing the work of an NCCER + employee at Shaw.  White employees seeking promotions and certifications were not subjected to the same delays.

134.    Vaughn's foreman, Penka, assigned him to tasks on a daily basis that constituted the "hands on" NCCER test.  Still, Penka delayed making arrangements for the General Foreman, Dan Pete, to "sign off" on Vaughn's work.  Once observed, Vaughn had to wait an additional three to four weeks, until July 28, 2012, to be placed in Shaw's system as qualified to received NCCER+ pay.  As a result, Vaughn started to receive $25 an hour, but did not receive retroactive pay.

135.    Vaughn was terminated on or about September 8, 2011 for cell phone usage. Vaughn does not dispute that he received a phone call from his wife after working at Shaw for ten straight hours.  Fifteen minutes before the end of his ten hour shift, when his wife called, he answered his phone and was terminated immediately by Ed Wick from Human Resources who was standing nearby.  Vaughn received no prior disciplinary actions or write-ups. Additionally, Vaughn witnessed cell phone violations of white employees being brushed under the rug.  Gary Oglesbee, a white welder and another white employee, James, used their cell phones in the presence of the Safety Supervisor.  Neither employee was reprimanded or terminated.

136.    Vaughn filed a Charge of Discrimination against Shaw with the Equal Employment Commission in and around December 2011, and was received by the EEOC on December 27, 2011.

**ORIGINAL COMPLAINT**

137.    Vaughn attempted to reapply for work at Shaw at their Baton Rouge office.  He went into the office and inquired about a Pipefitter position and signed his name on a list.  He was told that Shaw was not doing any hiring.  However, while Vaughn was in the office, he witnessed White employees being called into the back to be hired for positions with Shaw. Shaw's failure to rehire Vaughn constitutes discrimination and upon information and belief is in retaliation for Vaughn filing a Charge of Discrimination with the EEOC.

## CAUSES OF ACTION

**Title VII and 42 U.S.C. § 2000e et. seq. of the Civil Rights Act of 1964,**

**as amended and 42 U.S.C § 2000e *et. seq.***

138.  Each Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

139.  The conduct alleged herein violates Title VII and 42 U.S.C. § 2000e *et. seq.* as Defendant has engaged in the practice of discrimination and retaliation against the Plaintiffs named herein who have asserted such claims.

140.  The conduct alleged herein violates Title VII and 42 U.S.C. § 2000e *et. seq.* as Defendant has engaged in the practice of discrimination in the form of disparate pay against Plaintiffs Derek Davis, Carlos Neal, and Pandra Vaughn.

141.  The conduct alleged herein violates Title VII and 42 U.S.C. § 2000e *et. seq.* as Defendant has engaged in the practice of discrimination in the form of lack of and/or delay in promotion against Plaintiffs Derek Davis, Shawn Keith, Carlos Neal, Marcus Richardson, Beowulf Snell, and Pandra Vaughn.

142.  The conduct alleged herein violates Title VII and 42 U.S.C. § 2000e *et. seq.* as Defendant has engaged in the practice of discrimination in the form of discriminatory layoffs

**ORIGINAL COMPLAINT**

and/or terminations against Plaintiffs Francis Moore, Derek Davis, Shawn Keith, Marcus Richardson, Beowulf Snell, and Pandra Vaughn.

143.  The conduct alleged herein violates Title VII and 42 U.S.C. § 2000e *et. seq.* as Defendant has engaged in the practice of discrimination in the form of failure to rehire against Plaintiffs Derek Davis, Marcus Richardson, Beowulf Snell, and Pandra Vaughn.

144.  The conduct alleged herein violates Title VII and 42 U.S.C. § 2000e *et. seq.* as Defendant has engaged in the practice of discrimination in the form of discriminatory discipline against Plaintiffs Derek Davis and Carlos Neal.

145.  The conduct alleged herein violates Title VII and 42 U.S.C. § 2000e *et. seq.* as Defendant has engaged in the practice of discrimination by creating a hostile work environment against Plaintiffs Francis Moore, Derek Davis, Shawn Keith, Carlos Neal, Marcus Richardson, Byron Ricks, Beowulf Snell, and Pandra Vaughn.

146.  The conduct alleged herein violates Title VII and 42 U.S.C. § 2000e *et. seq.* as Defendant has engaged in the practice of discrimination by retaliating against Plaintiffs Derek Davis, Shawn Keith, Francis Moore, Marcus Richardson, Byron Ricks, Beowulf Snell, and Pandra Vaughn for engaging in protected activity.

147.  Plaintiffs' requests for relief are set forth below.

## 42. U.S.C. §1981

148.  Each Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

149.  The conduct alleged herein violates Section 1981 of the United States Code as the Defendant has engaged in the practice of discrimination and retaliation against the Plaintiffs named herein who have asserted such claims.

**ORIGINAL COMPLAINT**

150. The conduct alleged herein violates Section 1981 of the United States Code as Defendant has engaged in the practice of discrimination in the form of disparate pay against Plaintiffs Derek Davis, Carlos Neal, and Pandra Vaughn.

151. The conduct alleged herein violates Section 1981 of the United States Code as Defendant has engaged in the practice of discrimination in the form of lack of and/or delay in promotion against Plaintiffs Derek Davis, Shawn Keith, Carlos Neal, Marcus Richardson, Beowulf Snell, and Pandra Vaughn.

152. The conduct alleged herein violates Section 1981 of the United States Code as Defendant has engaged in the practice of discrimination in the form of discriminatory layoffs and/or terminations against Plaintiffs Francis Moore, Derek Davis, Shawn Keith, Marcus Richardson, Beowulf Snell, and Pandra Vaughn.

153. The conduct alleged herein violates Section 1981 of the United States Code as Defendant has engaged in the practice of discrimination in the form of failure to rehire against Plaintiffs Derek Davis, Marcus Richardson, Beowulf Snell, and Pandra Vaughn.

154. The conduct alleged herein violates Section 1981 of the United States Code as Defendant has engaged in the practice of discrimination in the form of discriminatory discipline against Plaintiffs Derek Davis and Carlos Neal.

155. The conduct alleged herein violates Section 1981 of the United States Code as Defendant has engaged in the practice of discrimination by creating a hostile work environment against Plaintiffs Derek Davis, Shawn Keith, Francis Moore, Carlos Neal, Marcus Richardson, Byron Ricks, Beowulf Snell, and Pandra Vaughn.

156. The conduct alleged herein violates Section 1981 of the United States Code as Defendant has engaged in the practice of discrimination by retaliating against Plaintiffs Derek

**ORIGINAL COMPLAINT**

Davis, Shawn Keith, Francis Moore, Marcus Richardson, Byron Ricks, Beowulf Snell, and Pandra Vaughn for engaging in protected activity.

     157.  Plaintiffs' requests for relief are set forth below.

### PRAYER FOR RELIEF

     **WHEREFORE**, Plaintiffs demand judgment against the Defendant as follows:

- Preliminary and permanent injunctions against the Defendant and their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

- A judgment declaring that the practices complained of herein are unlawful and in violation of the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1981 et seq.; the 1991 Civil Rights Act, as amended, 42 U.S.C. § 1981a et seq.; Title VII of the Civil Rights Act of 1964, as amended and 42 U.S.C. § 2000e et seq.

- Granting an order restraining Defendant from any retaliation in any form against Plaintiffs for participation in this litigation;

- Plaintiffs seek injunctive relief, including but not limited to:

  - Training on the subject of employment discrimination for all Shaw employees;

  - Diversity training for all Shaw managers conducted by reputable outside vendors;

  - Hire Human Resources representative for all locations, including off site facilities;

**ORIGINAL COMPLAINT**

- Supervisory discipline up to and including termination for any supervisor who engages in unlawful discrimination;
- Active monitoring of the work areas to ensure compliance with discrimination policies;
- All promotional opportunities posted on all employee bulletin boards; and
- Monitoring by the Court or a Federal Agency to ensure that Shaw complies with all injunctive relief.

- All damages which Plaintiffs have sustained as a result of Defendant's conduct, including back pay, front pay, general and special damages for lost compensation, and job benefits they would have received but for Defendant's discriminatory practices, and for emotional distress, humiliation, embarrassment, and anguish;

- Front pay to the Plaintiffs until such time as they can be placed into the same position, title and grade they would now occupy but for Defendant's discriminatory practices;

- Reinstatement of Plaintiffs in positions for which they are qualified;

- Exemplary and punitive damages in an amount commensurate with Defendant's ability and so as to deter future malicious, reckless and/or intentional conduct;

- Awarding Plaintiffs their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees and other costs;

- Pre-judgment and post-judgment interest, as provided by law; and

- Granting Plaintiffs other and further relief as this Court finds necessary and proper.

**ORIGINAL COMPLAINT**

Respectfully submitted,

/s/ Jay D. Ellwanger_____
Jay D. Ellwanger
Texas State Bar No. 24036522
jellwanger@dpelaw.com
Stefanie T. Scott
Texas State Bar No.24061617
sscott@dpelaw.com
**DiNovo Price Ellwanger& Hardy LLP**
7000 North MoPac Expressway, Suite 350
Austin, Texas  78731
Telephone: (512) 539-2626
Facsimile: (512) 539-2627
jellwanger@dpelaw.com

*Of Counsel:*

James A. Vagnini
N.Y. State Bar No. 2958130
jvagnini@vkvlawyers.com
Robert M.Valli, Jr.
N.Y. State Bar No. 2383107
rvalli@vkvlawyers.com
Sara W. Kane
N.Y. State Bar No. 2935617
skane@vkvlawyers.com
Deborah L. Rubin
N.Y. State Bar No. 4840872
Drubin@vkvlawyers.com
**Valli Kane &Vagnini, LLP**
600 Old Country Road, Suite 519
Garden City, New York 11530
Telephone: (516) 203-7180
Facsimile: (516) 706-0248

Pamela W. Carter
LA State Bar No. 24048
pcarter@carterlawgroupllc.com
**Carter Law Group, LLC**
1055 St. Charles Avenue, Suite 222
New Orleans, Louisiana  70130
Telephone: (504) 527-5055
Facsimile: (504) 527-5056

**ATTORNEYS FOR PLAINTIFFS**

**ORIGINAL COMPLAINT**